IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-30302

---

RICHARD L. CONKLING,

Plaintiff-Appellant,

versus

BERT S. TURNER,

Defendant-Appellee.

---

Appeal from the United States District Court for the
Middle District of Louisiana, Baton Rouge

---

April 6, 1998

Before POLITZ, Chief Judge, GARWOOD and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

In the previous appeal of this case, we affirmed in part and reversed and remanded in part the district court's April 1992 judgment dismissing the entire suit of plaintiff-appellant Richard L. Conkling (Conkling) against defendant-appellee Bert S. Turner (Turner).[1]  *Conkling v. Turner*, 18 F.3d 1285 (5th Cir. 1994). Following remand, the district court, who had presided throughout the proceedings leading to the earlier appeal, in February 1997 dismissed Conkling's remanded claims with prejudice, and Conkling again appeals to this Court.  The district court grounded its

---

[1]There were other defendants in the suit, but they have by now passed out of the case.

instant dismissal on the view that its April 1992 judgment, so far as it dismissed the claims we subsequently remanded, which claims had not been submitted to the jury, was based on the agreement of the parties and the court, made shortly prior to the March 19, 1992, discharge of the jury, that Conkling would not pursue such claims *if* this Court ultimately affirmed the judgment dismissing his other claims. Finding insufficient record support for such an agreement in these circumstances, we reverse and remand.

### Context Facts and Proceedings

Much of the relevant factual background is set out in our prior opinion, and we here repeat only so much of it as appears necessary to an understanding of our present holdings.

This suit was initially filed by Conkling in November 1985. It focused on Conkling's business relationships with Turner, which arose in January 1962 when Conkling went to work for Nichols Construction Company, a corporation formed by Turner and one Eaton. Turner then allegedly told Conkling he would give Conkling stock in Nichols, and in all related entities that Turner would later form, and that such stock would be redeemed at a fair price when Conkling's employment ended. In November 1962, Turner had a document prepared calling for Conkling and two others, St. Clair and Millican, to each receive 5% of Nichols' stock, with Turner and Eaton each receiving 42.5%. However, the parties later agreed to depart from this agreement. Thereafter, in May 1963, Nichols redeemed all of Eaton's stock, and, as a result, according to Conkling, his interest in Nichols increased from 5% to 8.69565%.

2

However, in June 1963 the parties signed an agreement (the 1963 agreement), prepared by Turner's attorney, reflecting Conkling's ownership to be 8%. Subsequently, Turner formed a number of related companies and partnerships, in at least most of which Conkling eventually acquired an 8% interest. As to one of these companies, Harmony Corporation, in which Conkling acquired an interest in March 1980, Conkling claimed that the same day his interest was wrongfully diluted by the issuance of shares to a third party "straw man" nominee for Turner, who ultimately put the stock in his own name in January 1982. Conkling was discharged from Nichols in December 1983, and Turner did not purchase his stock in Nichols or the other Turner entities.

In the instant suit, Conkling alleged civil RICO violations under 18 U.S.C. §§ 1962(c) & (d), and pendent claims under Louisiana law for breach of the oral 1962 contract to repurchase his stock in Nichols and the related companies and for breach of fiduciary duty. His primary contention was that the 1963 agreement was procured by Turner's fraud, and hence his interest in Nichols, and in the entities subsequently created by Turner, should have been 8.69565%, not merely the 8% which he ultimately received. Conkling also asserted claims that Turner Investments, Ltd. (TIL), an entity wholly owned by Turner and his family (and in which Conkling claimed no ownership interest or right thereto), charged Nichols and its affiliated concerns excessive fees for certain services.

As stated in our prior opinion:

3

"... Conkling alleged civil RICO violations under 18 U.S.C. §§ 1962(c) & (d). He also alleged pendent claims under Louisiana law for breach of fiduciary duty and breach of contract.

. . . .

After a protracted discovery, the defendants filed motions to dismiss and for summary judgment. A lengthy joint pre-trial order defining the issues for trial was signed by the judge on October 17, 1991, and filed on October 21, 1991 (the 'pre-trial order'). Prior to trial, by order entered January 21, 1992 (the 'pre-trial summary judgment'), the district court granted the defendants' summary judgment motions in part, dismissing (i) Conkling's RICO predicate act based upon Turner's alleged refusal to redeem his stock in Nichols and affiliates, (ii) certain derivative claims, (iii) Conkling's claims for wrongful discharge, denial of access to corporate records, and damages due to the corporations' use of an unfavorable depreciation method, (iv) all claims against Carpenter, and (v) certain miscellaneous claims not discussed in this appeal. In response to requests from both parties, the district court clarified the pre-trial summary judgment by order of February 5, 1992 (the 'clarification order'), to confirm that it had 'dismissed all claims which are shareholder derivative claims in nature, including any claim involving Harmony to the extent that such claim is derivative.'

The weekend before trial, the district court announced that it would sever the issues to be tried and would try only a single alleged predicate act—fraud in the 1963 agreement—with respect to Conkling's civil RICO claims in the first phase of trial. The court also stated that the breach of contract claim would be tried in this initial phase. After Conkling presented his case, both parties moved for judgment as a matter of law; the district court granted the defendants' motion with respect to Conkling's breach of contract claims. The 1963 agreement issue was submitted to the jury, which found that Turner did not commit fraud in the 1963 agreement. As a result of the jury's verdict on this issue, the district court, on April 9, 1992, entered summary judgment in favor of the defendants on the remainder of Conkling's complaint, both under civil RICO and breach of fiduciary duty (the 'post-trial summary judgment')." *Conkling*, 18 F.3d at 1292.

On appeal from the April 1992 judgment, Conkling raised four

4

points of error. His point I contended that the district court erred in ordering that the RICO counts be separately tried so that only the single predicate act of alleged fraud in the 1963 agreement would be tried in the first phase. We rejected that contention. We likewise rejected the contention made by Conkling's point IV that the district court erred by excluding at trial evidence of an alleged oral agreement between Turner and Conkling concerning Nichols stock ownership made after November 1962 and before June 1963 and in instructing the jury in that respect. In his point III Conkling argued that the district court erred in granting, after Conkling had rested, Turner's motion for judgment as a matter of law on Conkling's claim of breach of the alleged oral contract to repurchase his shares. We rejected this contention, agreeing with the district court that there was no contract because there was no agreement as to price. For the same reason, we rejected Conkling's related contention (made in part C of point II of Conkling's brief) that the district court erred in its pre-trial summary judgment ruling that the alleged breach of that contract was not cognizable as a RICO predicate act.

Conkling's remaining contentions were presented in parts A and B of his point II on appeal. In part A he argued that the "post-verdict summary judgment" on the RICO counts was improper because there were fact issues as to other RICO predicate acts besides the alleged fraud in the 1963 agreement (or matters the asserted wrongfulness of which depended on that agreement being fraudulent), including the Harmony transaction, matters concerning Merit

5

Industrial Constructors, Inc. (Merit), and the TIL related claims. We rejected this contention. We held that the Merit related claims had all been waived in the trial court when, on the record, Conkling had agreed they would be considered only as evidentiary of other claims, not as claims or as RICO predicate acts on their own, and that the TIL and other similar claims were all either derivative claims Conkling had no standing to bring or were dependent for their validity on there being fraud in the 1963 agreement.[2] We recognized that there were fact issues concerning the Harmony claim, but held that as a single predicate act it did not suffice to make a RICO claim, which required two predicate acts. We stated:

> "The trial court correctly perceived that the predicate acts remaining for jury resolution—with the exception of Harmony—were contingent as a matter of law upon a finding of fraud in the 1963 agreement. Accordingly, we hold that the trial court did not err in granting summary judgment to the defendants on the RICO case." *Id*. at 1299.

In part B of his point II Conkling argued that the district court erred in granting "the post-verdict Summary Judgment on Conkling's Breach of Fiduciary Duty Claim." We partially sustained this point, stating:

> "The district court determined 'that there is no factual or legal basis to support [Conkling's] breach of fiduciary claim.' Accordingly, it granted summary judgment on Conkling's breach of fiduciary duty claim.

---

[2]As to a claim regarding Gymco, we held Conkling did not proffer sufficient evidence "to defeat summary judgment." *Conkling*, 18 F.3d at 1297, 1298. A claim as to depreciation was held waived by Conkling's failure to brief it in his opening brief on appeal. *Id*. at 1299.

. . . .

Turner contends that the fiduciary duty claims are based upon the same facts already found to be fatally deficient as causes of action as discussed both *supra* and *infra*. However, after careful review of the record on appeal, we have not found that Turner moved for summary judgment on all of the breach of fiduciary duty issues.[15] Specifically, Turner did not move for summary judgment in the court below on the basis that the Harmony dilution claims pled as a breach of fiduciary duty could be summarily adjudicated; rather, he argued only that Conkling did not have standing to assert Harmony claims derivatively.[16] In fact, Turner has conceded on appeal that a fact issue exists with respect to the Harmony dilution transaction. Although that claim, as noted above, was properly adjudicated in the RICO context on the basis that it was the only predicate act available to Conkling, we conclude that the conceded fact issue preserves it in the fiduciary duty context.

Similarly, Turner did not request summary disposition of the fiduciary duty claims relating to the 1963 agreement and its progeny. The summary judgment arguments and the jury issue went to whether any of the actions or omissions stemming from that agreement were fraudulent—not whether they constituted a breach of any fiduciary duty. With respect to these claims, therefore, Turner could not have met his initial summary judgment burden of pointing out an absence of any fact issues by identifying portions of the pleadings, discovery, and affidavits which support its position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Thus, the trial court's grant of summary judgment on these fiduciary duty issues was in error.

[15] Many of the fiduciary duty claims were raised on summary judgment below. For example, Turner argued in his summary judgment papers that Conkling did not have standing to bring any of the asserted derivative claims as a matter of law, a position adopted by the district court. Moreover, and as discussed above, Conkling waived any damage claim with respect to the Merit transactions, and we interpret this waiver to include damages for breach of fiduciary duty. There is also an indication in Conkling's Supplemental Memorandum in Opposition to Defendants' Motions for Summary Judgment filed on December 11, 1991, that the court below *sua sponte* raised the issue of whether its decision in *Nichols Constr. Corp. v. St. Clair*, 708 F.Supp. 768 (M.D. La. 1989), *aff'd mem.*, 898 F.2d 150 (5th Cir. 1990), was 'applicable

7

to the pendent breach of fiduciary duty claim asserted in this case by' Conkling. The *Nichols* case addressed St. Clair's similar allegations about an agreement to redeem, which the trial court rejected. Thus, these fiduciary duty claims appear to have been addressed and resolved in the summary judgment framework.

[16]    As noted above, the Harmony transaction, like many of the others, involved both derivative claims and individual claims between which the district court distinguished in granting and clarifying summary judgment. The clarification order explains that the trial court specifically disposed of the Harmony derivative claims, but retained the dilution claims." *Id*. at 1299-1300.

We summarized our disposition of the appeal as follows: "For the foregoing reasons, we reverse and remand the district court's summary adjudication of Conkling's breach of fiduciary duty claims as described above. In all other respects, we affirm the judgment of the district court." *Id*. at 1305.

Following our remand, Turner in August 1996 moved for dismissal or summary judgment on the remanded claims, asserting:

"After the case was given to the jury, the Court convened a conference in chambers to discuss with counsel for the parties how the case would proceed if the jury's verdict was favorable to the defendants and how it would proceed if the verdict was favorable to the plaintiff.[1] If the verdict was favorable to the defendants, the RICO claims would be dismissed. At that point, if the trial was to continue as to the remaining causes of action (i.e., breach of fiduciary duty under Count III of the Complaint), the jury would be ordered to return; if not, the jury would be discharged. After the jury returned a defense verdict, plaintiff's counsel waived trial of any remaining claims at that time; no further evidence was produced and plaintiff did not object to the discharge of the jury.

Later, based upon the jury's verdict, the Court's ruling dismissing the state law implied contract claim, the waiver by counsel of trial of any remaining claims, the defendants previously filed motions for summary judgment and the defendants' motions for involuntary dismissal under Fed. R. Civ. P. 50, this Court entered

8

judgment dismissing all of plaintiff's claims against all defendants.

> [1]Counsel is unsure as to whether the chambers conference occurred on the evening of March 18, 1992 or the morning of March 19, 1992. Despite diligent search by counsel, court reporters and the Court, no transcript of this conference can be located. The Court's Order of April 9, 1992 makes reference to a procedure agreed upon by the Court and parties prior to the jury's verdict. Counsel believes this to be a reference to this same chambers conference and the discussions which lead [sic] to plaintiff's waiver of all remaining claims."[3]

In his response filed August 23, 1996, Conkling, represented by new counsel, asserted:

> "There was, and is, no evidence in the record of any agreement between the parties as to any 'procedure' which was to be followed depending upon the jury verdict. Although the Court stated that it wanted to discuss with counsel for the parties a procedure for handling matters remaining after the jury reached its verdict, no procedure was ever established. There is no evidence that Conkling agreed not to pursue the nine (9) claims not tried to the jury."[4]

Conkling also moved the district court to recuse itself as it might be a witness to what had happened in the 1992 trial.

A hearing was held by the district court on August 30, 1996, at which two of the lawyers representing Turner and two of the lawyers who had previously represented Conkling testified.[5] The essence of the testimony of Turner's lead counsel (Phillips) is the following:

---

[3]Turner's motion also raised limitations and merits defenses to the remanded claims.

[4]Conkling also asserted, as he does on this appeal, that Turner raised the same argument on the prior appeal, and we implicitly rejected it.

[5]The district court determined it would listen to the testimony before deciding whether to recuse.

9

"It is my recollection that a conference occurred after the jury brought in its verdict. Now, I cannot tell you whether or not there was a conference on the previous evening. I just don't remember.

And it's possible that the conference that I recollect could have occurred on the previous evening but I do not think so.

. . . .

There was a discussion . . . during the conduct of the trial and particularly towards the end, there being a recognition that if the verdict was favorable to the plaintiff, then the case would continue and would be submitted to the jury on the issue -- all of the issues that were involved in a RICO complaint, plus whatever else would have went to the jury. And then if the verdict was in the favor of the defendant, with a finding of no fraud, then there had to be some disposition of the remaining issues in the trial because it was acknowledged that the fraud issue -- just the jury's finding on fraud . . . would specifically eliminate nothing but the RICO case, and we would have to consider the other counts.

One of the counts was disposed of by the court . . . before the matter went to the jury. It was taken from the jury and . . . I believe it was count . . . which had to do with breach of the alleged contract to redeem, and the court took that away from the jury and found for the defendant on our [Rule 50] motion . . . .

. . . .

Q. The specific issue of what was to be done after the jury verdict; was that discussed in the conference you described earlier, attended by yourself and Mr. Tulley [associate counsel for Turner] and Mr. Beckner [lead counsel for Conkling]?

A. Yes, sir.

Q. And do you recall that discussion?

A. Well, it's my recollection -- now, this is -- and I have looked for notes and I cannot find any notes that I made, or in our files . . . . Could find no notes; but it's my recollection that after the jury brought in its verdict, and the things that come in my mind is that Mr. Conkling left the courtroom. I remember that he left and went out and I didn't see him again. And the judge called us in his office, in his chambers in the big

10

conference room with a long oak table. And we were there and, of course, we were quite pleased that the case was -- that we had prevailed with the jury on the issue, on the RICO claim. And it was discussed among all of us that this -- there would only be one predicate act; there was only one predicate act left . . . that could possibly be involved, and that was the Harmony claim. And that that one predicate act would not support a judgment for the plaintiff in the RICO matter. And Mr. Beckner, I think, discussed that issue and the court essentially said that that would be the order -- the decision of the court.

And then the discussion of what was left was of the remaining issue; it's my recollection that -- and I do remember this, that Mr. Beckner [Conkling's lead counsel] made the statement, I can't use his precise words, but that -- his statement was, in effect, that with the RICO case gone, there was not enough left for him to try. To be tried. And it was -- that was his statement that I remember at that meeting. And I think it was held -- that meeting took place, it's my recollection, after the jury brought in the verdict.

Q. Do you have a recollection of returning to the courtroom after that meeting?

A. I do not.

. . . .

Q. Do you have a recollection at the conference of Mr. Beckner objecting and insisting that everyone return to the courtroom so that the trial could proceed?

A. I do not, and . . . it's my recollection that he did not acquiesce in the fact that there were . . . inadequate predicate acts to fuel a RICO claim, but it's my recollection that he said if that was the court's ruling, well, then he had no desire to try the rest of the case."[6]

---

[6]Counsel also testified that the district court "considered it would be desirable to have a court reporter in at all of our conferences and it's my recollection that we had a court reporter in at that conference that I referred to, but unfortunately I understand there is no record of it." There is nothing else indicating that a court reporter was in fact present at the mentioned conference, nor, if one was, of any explanation (such as death of the reporter, loss of the reporter's notes, or the like) for the absence of any record of the mentioned conference.

Turner's associate counsel testified that there was a conference—"I don't remember whether it was just before or just after the verdict was returned"—at which the district judge, he, Turner's lead counsel, and both counsel for Conkling were present (he did not recall whether a court reporter was present) and at which:

> "We discussed the issue of what was left to be tried after a judgment in favor of the defendants on the fraud issue. And I remember specific mention being made of the -- of claims arising out of the Harmony transaction.
>
> Q. And what specific mention of those claims was made, and by whom?
>
> A. I think we mentioned it, Mr. Beckner [Conkling's lead counsel] mentioned it, and everybody acknowledged that a finding of no fraud did not dispose of everything in the case. And the one particular aspect that everyone focused on was the Harmony situation. And I recall Mr. Beckner stating that if his RICO case was dismissed because of the finding of no fraud, that the stand alone Harmony claim wasn't big enough or sufficient enough to justify his going forward and that he would just take it up to the Fifth Circuit.
>
> Q. So, was it your understanding that if the jury verdict was favorable to the defendants, that the RICO case would be dismissed because of lack of sufficient number of predicate acts?
>
> A. Right.
>
> Q. And if that, in fact, occurred, was it Mr. Beckner's position that there was not going to be any further evidence; nothing further at trial?
>
> A. That's right.
>
> Q. And did he express that to the court and counsel?
>
> A. Yes."[7]

---

[7]Turner's associate counsel further testified that after this conference there was never any further argument before the court.

12

Conkling's lead attorney (Beckner) testified that while the jury was deliberating, apparently on the afternoon of Wednesday, March 18, 1992, he and his wife were sitting outside the courtroom, where Turner was also waiting, both of Turner's attorneys having gone into the court's chambers. Turner complained about waiting, and Conkling's attorney testified:

> "When I went back in there to tell Mr. Phillips [Turner's lead counsel] what Mr. Turner had said, the court told me that in the event that the jury came back with a verdict of no fraud, that it was going to reconsider its motions for summary judgment that had been filed by the defendants . . . . And the court just stated that as its decision; but there was no court reporter there. And I understood that that was how the court felt about it, that in the event that the decision was no fraud, that it was going to reconsider its motions for summary judgment. And that was said to me in the space of just a very, very, very brief period of time. I had already suspected that that was how the court was going to handle the situation. So, it came as no real surprise when the court told me that."[8]

Conkling's lead attorney testified he did not consider this a conference, and that there was no chambers conference on Thursday, March 19, before or after the jury verdict. He specifically denied making the statements attributed to him by the testimony of Turner's lawyers, and under questioning by the court stated:

> "When I came back into the room to get Mr. Phillips, you told me that if the verdict was no fraud, that you were going to reconsider the defendants motions for summary judgment.
>
> . . . .

---

[8]Conkling's lead attorney also testified that he believed the court's "decision to revisit the defendant's motions for summary judgment in the event of an adverse verdict for Mr. Conkling, came about as a result of hearing the evidence that was adduced at trial."

. . . I didn't say that I wasn't going to proceed with the remaining claims. . . . And I just never made the statement I wasn't going to proceed with the remaining claims.

    **THE COURT:** And so, you didn't object to my discharging the jury, even though we had remaining claims?

    **THE WITNESS:** No, because you told me that in the event the jury came back no fraud, that you were going to reconsider the defendants motions for summary judgment.

    That was the procedure that you had decided to go with.

    **THE COURT:** But how could I do that with the jury still there?

    **THE WITNESS:** You dismissed the jury."

The court questioned Conkling's lead counsel about the reference to arguments on motions appearing in the final portion of the transcript of the 1992 trial reflecting the following, after receipt of the verdict and poll of the jury on Thursday, March 19, *viz*:

"The Court: . . . I just wanted to say thank you to you, okay.

    So the jury will be excused and just wait for me just for a couple of minutes.
(Jury excused 1:54 p.m.)

    The Court: Okay. We agreed last night that we would have arguments on the motion on Friday at 9:00 if anybody wants oral argument.

    Why don't I just let you think about it. It is 9:00 Friday unless everybody -- unless everybody calls me back and says they don't want it. But that was the only motions that I took under advisement.

    Okay. All right. We will be at recess.
(Recess 1:55 p.m.)"[9]

---

[9]The transcript of the 1992 trial concludes at this point.

14

Conkling's lead counsel testified in this regard as follows:

> "This is what I understood the court to mean; that we agreed last night that the court was going to reconsider the defendants motions for summary judgment. And that if you wanted to have arguments, we could have them at 9:00 on Friday morning.
>
> And it's my recollection that both parties concluded that no additional argument was necessary."[10]

Conkling's other attorney had no relevant independent recollection of the events at issue. He recalled no conferences with the judge after the case was submitted to the jury, except one concerning a jury note asking for some evidence.[11] He recalled no waiver or dismissal of claims after the case was submitted to the jury.

At the conclusion of this August 30, 1996, hearing, the court took Conkling's recusal motion under advisement.

On February 13, 1997, the court heard further oral argument on Conkling's motion to recuse and on the portion of Turner's motion to dismiss based on the assertion that just after (or just before) the verdict Conkling's lawyer had said he would not further pursue

---

[10]The testimony of all concerned reflected that there were no arguments on motions following the jury verdict. Nor is there any record of such.

[11]The attorney testified:

"Sitting here today, I don't recall. The only thing I recall after the jury went in, the only picture I have in my mind, is at some point we were in the judge's conference room; I don't think we were having a conference because I think we were just sitting, the jury had gone in and I was talking to his then law clerk . . . . Whether we had a conference before that, sitting here today, I don't recall."

15

the claims that we ultimately remanded.[12]  The court denied the

motion to recuse, stating that he did so:

> ". . . because the evidence that the court is
> relying on is evidence of things that actually happened
> before me, facts learned by me presiding in this case in
> open court based on the record here, . . . the transcript
> of the trial, . . . the minute entries and opinions that
> I wrote post-trial and the fact that I discharged the
> jury . . . and it's clearly reflected in this
> [transcript] passage that Mr. Phillips just read, that I
> was very concerned, very concerned about what to do with
> the remaining issue.  And the statement that I made,
> namely that I don't want to cause any problems by
> discharging this jury. . . .
>
> I don't think I need, and I will not take into
> consideration anything that was said at this hearing that
> we conducted . . . [the August 30, 1996, hearing].  I
> don't think it's necessary to do that.  I think I can
> rely solely on my minute entries, on my comments in the
> record that's set forth in the transcript and my clear
> understanding without any objection from either
> plaintiff's counsel or defense counsel at the time I
> discharged the jury."

In granting the motion to dismiss, the court ruled that:

> "The agreement reached by the parties was that in light
> of the verdict that came in, the remaining count would
> not be tried, that an appeal would be taken, that if on
> appeal plaintiff was successful in reversing the jury or
> if I even did it in a post-trial motion, that count that
> we didn't try would be retried or would be tried later.
> But if I didn't reverse the verdict or if it was affirmed
> on appeal, then that remaining count would not be tried.
> Based on that understanding I discharged the jury."[13]

---

[12]The district court did not at any time rule on or address
Turner's motion to dismiss or for summary judgment on a limitations
and/or merits basis.

[13]Other similar descriptions then given by the court of the
agreement it found are the following:

> "Nobody made an objection to the discharge of the jury;
> nobody did.  And it's like it's a limited -- my
> understanding was it was a limited type of dismissal.  It
> wasn't like dismissing with prejudice.  It was like you
> -- the verdict came in and because of that verdict we

16

On the same day, the district court signed an order directing that the case be dismissed with prejudice "[f]or the oral reasons assigned." Conkling now appeals the resulting judgment of dismissal with prejudice.

**Discussion**

I. Law of the case

Conkling contends that Turner's argument asserting that Conkling abandoned the remanded claims before discharge of the jury was implicitly rejected by this Court in the prior appeal. Conkling states that Turner raised this contention in two passages of his brief on that appeal. The first is a footnote in the "statement of the case" portion of Turner's brief stating:

> "[3]After the jury returned its verdict and the court had entered its rulings on the Fed. R. Civ. P. 50 motion and the summary judgment motion, the court conducted a conference with counsel at which time counsel for Conkling was asked whether he wished to proceed with trial of the alleged securities fraud involving Harmony as a stand-alone (non-RICO) claim. Counsel declined. (This discussion is not part of the record, but counsel for defendants believes this representation to be accurate and undisputed. It is offered to explain why the Harmony securities fraud claim was included in the judgment dismissing the entirety of plaintiff's suit)."

> don't try the remaining issue.

> But if on appeal the Fifth Circuit reverses this judgment or if you grant a new trial on this judgment, then we can come back and pick this other one up. And that was the agreement in this case."

and,

> "It was an agreement between all parties that the jury would be discharged, that remaining count would not be tried, an appeal would be taken. If there was a reversal, that remaining claim would be brought back up. If there was -- if it was affirmed, the case was over."

17

The second is contained in the portion of Turner's brief responding to Conkling's contention (made in part A of his point II in his appellant's brief) that the district court erred in granting "The Post-Verdict Summary Judgment on Conkling's Complaint Alleging Violations of 18 U.S.C. § 1962(c) and (d)-Counts I and II."  The language cited by Conkling is the following:

> "Conkling's argument regarding 'Harmony Corporation: Securities Fraud, Predicate Act (2)' (Conkling's original brief, p. 20-22) deserves special mention.  As discussed above, dismissal of the RICO counts resulted from plaintiff's legal inability to meet the basic requirements of 18 U.S.C. 1962(c) or (d).  When the RICO claims were dismissed, this securities fraud claim technically remained viable.  In fact, during a post verdict conference with counsel, plaintiff was offered, but refused, the opportunity to move forward with trial of this claim.  Although under federal law, this claim was probably filed too late or was inadequate to support a RICO case, [footnote omitted] it is erroneous for Conkling to say that it was dismissed as part of the court's grant of summary judgment on the RICO counts."[14]

Conkling also points to Turner's letter on the prior appeal responding to a post-argument letter of inquiry from this Court. This Court's letter inquired about how the district court disposed of any claim Conkling may have made under section 10b of the

---

[14]In the portion of his prior appeal reply brief directed to his contention that the district court erred in granting post-verdict summary judgment on the RICO counts, Conkling states:

> "Incidentally, defendants assert that after the jury verdict on the single predicate act tried the district court conducted a conference in which Conkling's counsel allegedly declined to proceed to trial on the Harmony predicate act, thereby causing the district court to grant summary judgment on this predicate act. Defendants' assertion is _unequivocally incorrect_.  No such conference ever occurred.  There is _no record_ of any such conference.  Conkling's counsel _never_ made any such statement."  (Emphasis in original).

Securities Exchange Act in respect to Harmony, other than simply as a RICO predicate act.[15] In his response to this letter, Turner's counsel wrote this Court asserting that Conkling never made any stand alone section 10b securities fraud damages claim as to the Harmony transaction, but merely asserted it as a RICO predicate act, and that in any event at an unrecorded status conference after the jury charge Conkling's counsel informed the court he would not proceed with any other claims if the jury verdict were adverse to Conkling, which was the reason any Harmony "stand alone" securities fraud claim was included, though not specifically mentioned, in the dismissal called for by the order for judgment entered April 9, 1992 (dated April 7). Turner's letter suggested the possibility that because the asserted status conference was unrecorded, this Court might want to order "that this issue be directed to the District Judge for submission of additional reasons for the inclusion of the Harmony securities fraud claim in the judgment of

---

[15]Our letter references certain paragraphs of the October 1991 pre-trial order "which imply that plaintiff-appellant Richard L. Conkling asserted a claim against the defendants-appellees for violations of section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, in connection with an alleged dilution of his interest in Harmony Corporation," and goes on to state:

> "The panel is unable to find any place in the record on appeal which indicates whether the district court decided this claim under the securities fraud laws as distinguished from its treatment of the claim as a RICO predicate act. The parties are therefore directed to file letter briefs with this court on or before Wednesday, February 23, 1994, providing record citations that reflect the district court's disposal of this claim."

dismissal."[16]  In response to this letter, Conkling's counsel wrote

[16]The relevant portions of Turner's letter are the following:

"In the complaint, Conkling made no separate claim for damages, apart from his RICO claim, resulting from the allegations of securities fraud in the Harmony transaction . . . .  Conkling describes his suit as seeking treble damages under RICO and damages under certain pendent state law claims. . . .  Count I of the complaint seeks recovery under 18 U.S.C. § 1961(4); Count II alleges violations of 18 U.S.C. §§ 1962(d) and 1964(c); Count III is a pendent state law claim for breach of fiduciary duty; Count IV is a pendent state law claim for breach of an implied contract.  Nowhere in the complaint does Conkling expressly articulate a claim for damages under 10(b)-5 other than as a part of his RICO claim.  In the pretrial order . . . Conkling describes 'The Harmony Fraud,' and contends merely that it was 'an artifice to dilute Mr. Conkling's interest in Harmony in relationship to Turner's interest.'  This is part of Conkling's overall contention that he did not receive the percentage in certain entities that he believed he was entitled to receive.  Again, Conkling makes no specific 10(b)-5 damage claim.

. . .  Plaintiff never amended the complaint to allege separate damages resulting from this transaction (even though he had the opportunity to do so even up to the order of dismissal) and, in view of his ultimate decision not to pursue this claim after the jury verdict, apparently never truly considered it anything other than a predicate act.

. . . .

Defendants respectfully submit that . . . an unrecorded status conference was held in chambers. . . . It was during these discussions that plaintiff's counsel informed the court that he would not proceed with any other claims, presumably including any 'stand alone' securities fraud claim involving Harmony, if the jury's verdict was adverse to Conkling [footnote omitted; emphasis in original].

The jury returned a verdict favorable to defendants and, based upon the procedure previously agreed upon, the court discharged the jury. . . .  On April 7 [sic], the court entered an order dismissing plaintiff's case, making specific reference to the 'procedure' agreed upon

20

to this Court asserting there never was any unrecorded status conference at which he stated he would not proceed on other claims if the jury verdict was adverse to Conkling.  Conkling's letter also states, however, that the Harmony securities fraud claim "was

---

by the parties to be followed after the jury verdict. . . . Although the order does not specifically mention the Harmony securities fraud claim, it was included in the overall dismissal of Conkling's case.

. . . .

Any securities fraud claim associated with the Harmony transaction was dismissed by the court for two reasons:  it was waived as a separate cause for damage during the unrecorded status conference in chambers after the first part of the bifurcated trial was given to the jury; and regardless of the waiver, to the extent that the Harmony claim constituted a predicate act, it was properly dismissed as part of the RICO case. . . .

Despite a thorough and exhaustive search, including inquiries to court reporters, defendants have been unable to locate a transcript of the conference in which the agreed upon 'procedure' which lead [sic] to dismissal was established.  Counsel for defendants believe their recollection of these events to be both accurate and a logical explanation for the dismissal of the Harmony claim, particularly in light of the court's multiple record references to the agreed 'procedure' to be followed after the jury returned its verdict, and the absence of any objection by Conkling, either pre- or post judgment, to the dismissal of his entire case.

Recognizing that there is no express waiver of this claim on the record, defendants suggest in the alternative to this court's accepting their version of the events, that this issue be directed to the District Judge for submission of additional reasons for the inclusion of the Harmony securities fraud claim in the judgment of dismissal."

The letter also suggested that any stand alone Harmony securities fraud claim was probably barred by limitations.

21

asserted only as a RICO predicate act in Counts I and II."[17]

We reject Conkling's argument in this respect. While we recognize that "the law of the case" doctrine "comprehends things decided by necessary implication as well as those decided explicitly," *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir. 1974), it nevertheless "applies only to issues that were decided" and "'does not include determination of all questions which were within the issues of the case and which, therefore, might have been decided.'" *Id*.

We note, to begin with, that none of the arguments by Turner on the prior appeal which Conkling now cites were made in respect to the state law breach of fiduciary claim, and all related only to the putative "stand alone" Harmony federal securities law claim. Turner on the prior appeal made no such or similar argument as to the state law breach of fiduciary duty claim. Turner's argument as to that claim was solely that it was either improperly derivative

---

[17]The relevant portions of Conkling's letter state:

"The first inquiry of the panel is in reference to Conkling's allegation that the dilution of his ownership in Harmony Corporation resulted from a fraud in the sale of Harmony securities (stock) to him by the defendants. This fraud in the sale of securities claim was asserted only as a RICO predicate act in Counts I and II.

. . . .

There was never any unrecorded status conference in which any procedure was discussed or agreed upon depending on the possible verdicts, and there was never any unrecorded status conference in which Conkling's counsel stated that he would not proceed on any other claims if the jury verdict was adverse to Conkling on the single predicate act tried." (Original emphasis).

22

or was foreclosed by the jury's finding of no fraud in the 1963 agreement.[18]  Our prior opinion does not address any federal securities law "stand alone" claim in respect to Harmony, and addresses that matter only as a RICO predicate act, which, according to Conkling's (as well as Turner's) post-argument letter, is all it was.  It is beyond dispute that the district court's April 1992 judgment dismissed with prejudice the entirety of Conkling's suit, and that we affirmed that dismissal in *all* respects *except only* as to two portions of the state law breach of fiduciary duty claim which we reversed and remanded because they were disposed of by summary judgment and Turner's summary judgment motion as to those portions of the breach of fiduciary duty claim was inadequate.  Nothing in our prior opinion addresses or even

---

[18]Turner, in the portion of his appellee's brief on the prior appeal arguing that "the district court properly reconsidered and granted defendants' motion for summary judgment in the pendent state law breach of fiduciary duty claim," states in relevant part:

> "The plaintiff's breach of fiduciary duty claim is based upon the same conduct originally alleged to be predicate acts for purposes of the RICO claims.  Because the district court properly concluded that either the alleged conduct was not actionable by Conkling (i.e. was a derivative claim) or did not constitute any misrepresentations by Turner or any defendants owing Conkling a fiduciary duty (as a result of the jury's verdict as to the 1963 agreement), there was ample legal basis to grant the dismissal.  There were no genuine issues of material fact remaining to be tried.
>
> . . . .
>
> The jury found no fraud or misrepresentation to Conkling in the 1963 agreement. . . .  The court properly dismissed the remainder of this pendent state law claim on the grounds that there was absolutely no evidence to support it.

23

mentions any asserted agreement by Conkling not to pursue such claims or any asserted failure on his part to do so, or treats their disposition as being based on anything other than granting Turner's motion for summary judgment, which is what the order for judgment entered April 9, 1992, states. Moreover, there was nothing in the record then before us which would have allowed us to make any other assumption. There is nothing in our remand of the two portions of the state law breach of fiduciary duty claim which even suggests that Turner is precluded from having them dismissed prior to trial on a proper motion for summary judgment or on any other proper basis.

In sum, if the district court's post-remand dismissal is otherwise proper, our prior disposition does not preclude it.

II. Post-remand Dismissal Inadequately Supported

Conkling also argues that in any event the district court's post-remand dismissal is not justified. We agree.

As previously stated, the district court's post-remand dismissal was based on its conclusion that the parties through counsel and the court had agreed, some time on March 18 or 19, 1992, and before the jury was discharged on the latter date, that if the jury verdict were for Turner, or in light of such verdict, then Conkling would not pursue any claim that had not been tried *in the event* this Court affirmed the judgment on the other claims. We assume—at least *arguendo*—that such an agreement, properly documented or reflected in the record, could be enforced. As the district court recognized, however, nothing in the transcript or in

24

any order or writing whatever—including any letter to or from the court or any of the parties or counsel or even any informal notes of the court, counsel, or anyone else—reflects such or any similar agreement. Conkling's lead counsel has denied under oath making any such agreement, and his other counsel, more than four years after the event, simply had no recollection. Turner's lead counsel testified that Conkling's counsel stated after the verdict that if the court were to give judgment for Turner on the RICO count "then he had no desire to try the rest of the case." Turner's associate counsel, though he was unclear as to whether this occurred before or after the verdict, testified that Conkling's counsel said "if his RICO case was dismissed because of the finding of no fraud, that the stand alone Harmony claim wasn't big enough or sufficient enough to justify his going forward." The testimony by Turner's attorneys not only relates to statements after the verdict—in contrast to the district court who plainly was speaking of a pre-verdict agreement—but, more importantly, if credited would ordinarily have led to a dismissal of Conkling's pendent breach of fiduciary duty claim for failure to prosecute. *See Sturgeon v. Airborne Freight*, 778 F.2d 1154, 1160 (5th Cir. 1985); *Lopez v. Aransas County Independent School District*, 570 F.2d 541, 544 (5th Cir. 1978). *Cf. G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 951-53 (5th Cir. 1981) (plaintiff's counsel's announcement, at unrecorded conference to modify the pretrial order on the first day of trial, that evidence would not be presented on the section 10b-5 claim did not amount to dismissal or waiver of that claim, where

25

not incorporated into the pre-trial order and plaintiff's counsel later that day disputed any abandonment). But that is *not* what the district court then did. Rather, it expressly granted Turner's motion for summary judgment on that claim, because (as the April 1992 order recited) it found "there is no factual or legal basis to support plaintiff's breach of fiduciary [duty] claim which was set forth in the complaint," and dismissed the claim on *that* basis. By the same token, the testimony of Turner's attorneys does not describe any character of agreement, much less the unusual and somewhat complicated one found by the district court following remand, namely that Turner would be free to continue—*in this same suit*—his pendent breach of fiduciary duty claims if, but *only* if, this Court (or the district court acting on a post-judgment motion for new trial) were to reverse or order retrial of (presumably in whole or in part) the judgment for Turner on the RICO claims (or, presumably, on the breach of contract claim).

The district court, in support of its order following remand, also relied on the language in the second paragraph of its order for judgment entered April 9, 1992 (dated April 7), referring to following a pre-verdict agreement of the parties and the court as to the court's post-verdict procedure. While this language does indeed support the conclusion that there was some pre-verdict agreement between all concerned as to what would be done post-verdict, the April 9, 1992, order, taken as a whole, clearly does not support, but rather tends to contradict, the agreement found by the court following remand. The April 1992 order reads as follows:

26

"On March 19, 1992, the jury found that the defendants were not guilty of any fraud and that there was no redemption agreement entered into between the parties in 1962.[19]  At the conclusion of the evidence, both the plaintiff and the defendants moved for a judgment as a matter of law.  The Court finds that defendants' motion is moot.  The Court also finds that the evidence clearly supports the jury's verdict. Therefore, plaintiff's motion for judgment as a matter of law is denied.

Prior to the jury's verdict, the Court and the parties agreed to a procedure to be followed by the Court once the jury's verdict was returned.  Following that procedure, the Court finds as follows.

*The Court reconsiders its prior decision which denied defendants' motion for summary judgment* and now finds that plaintiff's claim under RICO should be dismissed since the jury found no fraud on the part of the defendants in this case.  *The Court also finds that there is no factual or legal basis to support plaintiff's breach of fiduciary claim which was set forth in the complaint.   Therefore, the Court finds that* the plaintiff's RICO claims and *plaintiff's breach of fiduciary claims must be dismissed as a matter of fact and law.   Accordingly, defendants' motion for summary judgment on these claims is granted.*

In summary, the Court finds as follows:

1.  Plaintiff's motion for a judgment as a matter of law is DENIED.

2.   Considering the jury's verdict, defendants' motion for a judgment as a matter of law is DISMISSED AS MOOT.

3.   *Upon reconsideration, defendants' motion for summary judgment is GRANTED, and plaintiff's claims under RICO and breach of fiduciary relationship are DISMISSED.*

_____

[19]On April 28, 1992, following the written suggestion of Turner's counsel, the first sentence of this order was amended to read as follows:  "On March 19, 1992, the jury found that the defendants were not guilty of any fraud after the Court had granted a judgment as a matter of law holding there was no redemption agreement entered into between the parties in 1962."  The court had, in fact, granted Turner's motion for judgment as a matter of law on the contract claim after the evidence closed and before the case was submitted to the jury.

27

4.  Judgment shall be entered dismissing plaintiff's entire case with prejudice at plaintiff's costs." (Emphasis added).[20]

This order expressly grants Turner's motion for summary judgment on the breach of fiduciary duty claim and orders its dismissal for that reason; and, it grants that summary judgment *because* "[t]he Court . . . finds there is no factual or legal basis to support plaintiff's breach of fiduciary [duty] claim which was set forth in the complaint." There is nothing in this order suggesting that Conkling refused to proceed further after the verdict or that the breach of fiduciary duty claim was dismissed for that reason. Nor does anything in the April 9 order suggest that Conkling agreed, or the court determined, that if the summary judgment on the breach of fiduciary duty claim were reversed on appeal, but the judgment on the RICO and contract claims were affirmed, that Conkling nevertheless would not pursue the breach of fiduciary duty claim. Indeed, the form of the April 9 order suggests the very opposite—that in such event Conkling *could* pursue the breach of fiduciary duty claim—for that is the legal effect of

---

[20]Following the jury's verdict, the district court initially, on March 23, 1992, simply entered judgment "[i]n accordance with the jury verdict" dismissing Conkling's entire suit with prejudice. On April 1, 1992, the Court entered an order vacating this judgment on its own motion, and reciting the judgment was improper because "[t]here are other issues remaining in the case for the Court to decide. The jury's verdict only decided some of the issues which are pending in this case . . . . After the Court decides the remaining issues in the case including the motions for judgment as a matter of law which were filed at the conclusion of the evidence by all of the parties, the Court will issue an appropriate judgment." Following the order of April 7 entered April 9, quoted in the text above, the court on April 10, 1992, signed a judgment dismissing Conkling's entire suit "[f]or the written reasons assigned."

28

the order, as our prior disposition reflects, absent some express provision to the contrary. The April 9 order is far more consistent with Conkling's attorneys' understanding—that he did not proceed with the breach of fiduciary duty claim because the district court had already said that it would dispose of that by reconsidering Turner's motion for summary judgment—than it is with the district court's post-remand view of what was understood between the parties and the court.[21]

We note also that on the prior appeal Turner defended the breach of fiduciary duty summary judgment on the merits (see note 18, *supra*), and never contended that it should not be remanded because there was an agreement not to pursue it should the judgment dismissing the other claims be affirmed.

The district court, in its remarks at the February 13, 1997, hearing, also relied on two passages in the transcript of the proceedings in the late afternoon and early evening of March 18, 1992. The first of these occurred after the jury arguments and the charge had been given and, at 5:02 p.m., the jury had been excused but told not to begin deliberations until so directed by the court. Then the court heard further objections to the charge. When this was completed, and just before the jury was brought back in to hear a portion of the charge which the court had earlier inadvertently failed to read to the jury, the court remarked to counsel as follows:

---

[21]This is not to say that the district court's understanding is factually incorrect; only that the April 9 order does not support (and indeed tends to contradict) it.

29

> "The Court:    One of the things I want to do when we get through with this, and y'all take a break or two, I want y'all to come sit down with me and tell me, depending on which verdict comes in, what we need to do. So, if you get a verdict tonight we can tell the jury to come or not come back.    I think we ought to start planning that phase (jury enters)."

The jury then entered and the court read the jury the previously omitted portion of the charge, and at 5:10 p.m. the jury was sent out with directions to begin its deliberations.  Thereafter the court directed the marshal to get the jury the verdict forms and counsel to get together the exhibits to be taken to the jury room. Then, after some instructions to counsel as to being available and the procedures to be followed if there were a jury note, the court made the following remarks to counsel (this being the second of the two paragraphs relied on by the court), *viz*:  "After y'all take a break for a few minutes, I want y'all to come see me and let's just sit and see what the effect of these verdicts are and where we're going to go from here, because I don't want to discharge the jury tonight erroneously."  The court then instructed counsel that if they wanted they could wait on the jury in two specific rooms "upstairs" or "outside in the hallway."  The transcript then reflects that there was recess from 5:15 p.m. until 7:34 p.m., when the jury sent in a note saying they wanted to go home for the evening.  The jury was brought in, and at 7:41 p.m. was excused for the evening and told to come back at 9:00 a.m. the following morning.  The court advised that it would be out of the courthouse in the morning but could be reached, and that counsel did not have to come to the courthouse the next day until there was a jury note.

30

The court suggested to the parties Conkling and Turner personally that they consider settlement, and at 7:45 p.m. recessed for the evening.

While these passages do reflect that the court was concerned about how to proceed after any verdict, wanted to avoid erroneously discharging the jury, and wanted to discuss this with counsel, they do not in any way suggest what was said or agreed on at any subsequent discussion.[22]

The above-noted transcript passage of the court's statement to counsel, just after the jury was excused following its verdict on Thursday, March 19, "[w]e agreed last night that we would have arguments on the motion on Friday at 9:00 if anybody wants oral argument," does reflect that there was an agreement for arguments on motions, but does not reflect any other or further agreement. Nor is it inconsistent with Conkling's counsel's asserted understanding, as stated in his testimony, that this referred to the court's statement the previous evening that the court was going to reconsider the defendant's motions for summary judgment.[23]  And,

---

[22]The court's minute entry for March 18, though going through the proceedings until the jury was discharged for the evening, does not mention any conference with counsel or any agreed procedure.

[23]The only relevant part of the court's minute entry for March 19 states:

> "The jury finds in favor of the defendants.  At the request of the plaintiff the jury is polled and all agree with the verdict.  Judgment shall be entered accordingly.
>
> As previously agreed by the parties, oral argument on the motions for judgment as a matter of law will be held at 9:00 a.m. on Friday, March 20, 1992."

31

that is what the April 9 order said the court did.

In sum, the court's reasons for its post-remand dismissal are ultimately not adequately supported by anything in the record other than the court's recollection of what was said by counsel during an informal, unrecorded status conference over four years previously, as to which no one, the court included, has any confirmatory order, minute entry, correspondence, or on-the-record remarks, or even informal notes, and as to which the recollections of the lawyers involved on each side differ not only from each other but also from the court's recollection.  Moreover, the most natural inferences from the April 9, 1992, order do not support, but rather tend to undercut, the district court's reasons for its post-remand disposition.  In these circumstances, the risk of misunderstanding what was said and intended years previously is simply too great to allow such a disposition to stand.[24]

---

While this minute entry refers to the motions to be argued as ones "for judgment as a matter of law," what was said in open court does not include any characterization of the motion[s] to be argued, and the April 9 order states that the court, post-verdict, granted Turner's motion for summary judgment.

[24]For example, the district court might have announced that it was going to grant summary judgment on the state law breach of fiduciary duty claim, and Conkling's counsel might then have said something generally like what Turner's associate counsel attributed to him, namely "if his RICO case was dismissed because of the finding of no fraud, that the stand alone Harmony claim wasn't big enough or sufficient enough to justify his going forward"; *but* Conkling's counsel may have been referring *only* to a stand alone Harmony *federal securities* law claim, not as part of a *state law* breach of fiduciary duty claim.  As earlier recited, Turner's appellee's brief on the prior appeal refers only to a purported statement by Conkling's counsel that in light of the verdict he would not pursue "the alleged securities fraud regarding Harmony as a stand alone (non RICO) claim."  As also previously observed, following oral argument on the prior appeal, this Court was

32

In analogous circumstances, we have held that while we would not insist on a signed, written stipulation for a post-answer voluntary dismissal under Fed. R. Civ. Proc. 41(a)(1) to be without prejudice, although the terms of the rule require that, nevertheless any oral stipulation "must, however, be unequivocal and in the record." *Ocean Drilling Explor. v. Mont Boat Rental Serv.*, 799 F.2d 213, 218 (5th Cir. 1986). This was thought necessary "to avoid later dispute." *Id*. *See also Camacho v. Mancuso*, 53 F.3d 48, 52-53 (4th Cir. 1995).[25]

---

uncertain whether the district court had disposed of any damage claim for violation of section 10b of the Securities Exchange Act of 1934 in relation to Harmony "as distinguished from its treatment of the claim as a RICO predicate act" (see note 15, *supra*, and accompanying text); Turner replied that such a stand alone federal securities law claim was never really made, and if made was abandoned (see note 16, *supra*); Conkling, though denying any abandonment, seemed to state such a federal securities law claim "was asserted only as a RICO predicate act in Counts I and II" (the RICO counts) (see note 17, *supra*, and accompanying text). Ultimately, on the prior appeal we affirmed the dismissal of *all* of Conkling's claims except only two portions of his *state law* breach of fiduciary duty claim, one being the "Harmony dilution claims pled as a breach of fiduciary duty" and the other being "the fiduciary duty claims relating to the 1963 agreement and its progeny," *Conkling*, 18 F.3d at 1300 (as to each of these two portions of the state law breach of fiduciary duty claim we held Turner's motion for summary judgment was inadequate and accordingly remanded).

[25]*Williams v. Edwards*, 87 F.3d 126 (5th Cir. 1996), cited by the district court, is not to the contrary. There the state appealed a 1995 order modifying an earlier consent decree contending that the district court had no jurisdiction because of the "sunset" provision of a 1983 order under the terms of which the case would have terminated in November 1989. However, in 1993 the district court, convinced that it had previously extended the 1983 order, entered an order indefinitely extending the 1983 order. The 1993 order was made retroactive to November 1989. The state did not appeal the 1993 order, and between 1992 and 1994 the state filed in the district court eleven motions to "partially terminate" specific, discrete portions of the 1983 order. We held that the state's jurisdictional challenge to the 1995 order on the basis

The district court's post-remand decision here was obviously taken in complete good faith and represents its sincere and conscientious view of what happened in March and April 1992. Nor do we purport to say that this is in fact not what actually happened. We do hold, however, that there is inadequate record support for the more than four-year-old oral agreement found by the district court, and too much room for confusion, doubt, and misinterpretation in that respect, to justify the belated dismissal of the remanded claims on the basis thereof. We consequently reverse the district court's February 1997 order of dismissal and remand the cause for further proceedings consistent herewith. The case shall proceed on the basis that the claims previously remanded are not precluded by any such agreement as found by the district court, nor by any failure to proceed or statement of intention to waive or the like (as urged by Turner in section 1 of his memorandum below in support of his post-remand motion to dismiss or for summary judgment).

III.  Recusal

Conkling urges that the district court should have granted his post-remand motion to recuse because in acting on Turner's motion to dismiss the district court was relying on its own recollection of the events of March and April 1992, and hence in some sense became the equivalent of a witness. This complaint of itself is likely rendered moot by our reversal of the February 1997 dismissal

---

that the 1983 order had terminated in November 1989 was foreclosed by its failure to appeal the 1993 order. *Id*. at 130-131.

34

order. However, Conkling also requests that we direct that on remand the case be assigned to another district judge. We decline to do so. To begin with, we do not conclude that the district court erred in denying the motion to recuse. As a general rule, for purposes of recusal, a judge's "'[p]ersonal' knowledge of evidentiary facts means 'extrajudicial,'" so "[f]acts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification." *Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.*, 991 F.2d 1249, 1255-56 (7th Cir. 1993).

> "Opinions formed by the judge that are based on . . . events occurring during the proceedings do not constitute a basis for recusal 'unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" *United States v. Landerman*, 109 F.3d 1053, 1066 (5th Cir. 1997) (quoting *Liteky v. United States*, 114 S.Ct. 1147, 1157 (1994)).

There is here no reflection of any such "deep-seated favoritism or antagonism" as would "make fair judgment impossible."[26] Conkling relies on *In re Murchison*, 75 S.Ct. 623 (1955), but we see here no invasion of the principle there relied on, namely that "no man is permitted to try cases where he has an interest in the outcome."

---

[26]We also note that nothing about the parties personally—Conkling and Turner—is or was involved in respect to the agreement relied on by the district court in its February 1997 order, the mentioned agreement being attributed solely to Conkling's then counsel. Since our remand, Conkling has been represented by other counsel (not of the same firm), and neither counsel who represented Conkling in the March and April 1992 proceedings continued to represent him in this case following our earlier remand.

*Id*. at 625. Nor is *Tyler v. Swenson*, 427 F.2d 412 (10th Cir. 1970), also relied on by Conkling, on point, for there it was charged that the judge, in the unrecorded chambers conference, engaged in improper threats to cause the defendant to plead guilty. Here, there has never been any assertion that the district judge did or said anything improper at the mentioned chambers conference.

## Conclusion

For the reasons stated, we reverse the district court's February 1997 judgment of dismissal and remand the cause for further proceedings not inconsistent herewith.

REVERSED and REMANDED