USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-9007

 WILLIAM FIELD and NORINNE FIELD,

 Plaintiffs, Appellants,

 v.

 PHILIP W. MANS,

 Defendant, Appellee.

 APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
 OF THE FIRST CIRCUIT
 
 

 Before
 
 Selya, Circuit Judge,
 
 Campbell, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 

 Christopher J. Seufert with whom Seufert Professional
Association was on brief for appellants.
 W. E. Whittington IV with whom Brooks McNally Whittington
Platto & Vitt was on brief for appellee.

 ____________________

 October 13, 1998
 
 ____________________
 CAMPBELL, Senior Circuit Judge. William and Norrine
Field (the "Fields") appeal from a judgment of the Bankruptcy
Appellate Panel for the First Circuit (the "BAP") allowing
defendant-appellee Philip W. Mans ("Mans") to discharge in
bankruptcy a debt owed to the Fields. The debt in question arose
from a personal guarantee by Mans of a note issued by his
corporation and secured by a second mortgage on development
property sold to him by the Fields. Events occurring after Mans's
undisclosed sale of the mortgaged property to a third party led the
Fields to charge that Mans had defrauded them into extending him
credit. The Fields urge us to reverse the BAP's judgment and hold
the debt non-dischargeable. For the reasons discussed below, we
reverse the BAP's determination and affirm the most recent judgment
of the bankruptcy court denying Mans a discharge. 
 I.
 The facts have been set out in a number of previously
published opinions, including the Supreme Court's opinion in
Field v. Mans, 516 U.S. 59 (1995). See also Field v. Mans (In re
Mans), 210 B.R. 1 (B.A.P. 1st Cir. 1997); Field v. Mans (In re
Mans), 203 B.R. 355 (Bankr. D.N.H. 1996); Field v. Mans (In re
Mans), 200 B.R. 293 (Bankr. D.N.H. 1996). Because of this, our
recitation below is limited to the essentials.
 On June 23, 1987, the Fields sold development real estate
(an inn) to a corporation wholly owned by Mans for $462,500. 
Mans's corporation paid $275,000 in cash and gave the Fields a
promissory note for $187,500. The note, personally guaranteed by
Mans, had a ten-year repayment period and was secured by a second
mortgage on the real estate.
 Under the terms of the second mortgage deed, Mans, as
mortgagor, covenanted and agreed not to convey the property to
anyone else without the prior written consent of the mortgagees,
the Fields. If Mans conveyed without their consent, the whole of
the unpaid balance and interest of the mortgage and note became
immediately due and payable, at the Fields' option.
 On October 8, 1987, Mans caused his corporation to
transfer, without the Fields' knowledge or consent, the mortgaged
real estate to a newly formed development partnership between
himself and one DeFelice. The transfer was by deed executed on
October 8, 1987, and recorded on October 19, 1987. In
consideration, Mans received $447,500 in cash at the closing of the
October 8 conveyance. At the time of this sale, Mans had made only
four payments on the second mortgage held by the Fields. He still
owed them approximately $180,000 in principal and $145,000 in
future interest.
 The day following the October 8 sale, Mans's attorney 
without revealing that the conveyance had already occurred wrote
to the Fields' lawyer requesting that the Fields consent to what
appeared to be a still-unconsummated sale of the mortgaged real
estate. This letter stated:
 Obviously, we do not want to trigger the "due-
 on-sale" clause by reason of the transfer of
 the property into the development partnership. 
 We ask that Mr. and Mrs. Field, as the holders
 of the second mortgage, consent in writing to
 the transfer of the property.

 We would appreciate your earliest response to
 this. We could avoid the issue entirely by
 simply putting the stock of [Mans's
 corporation] into the partnership instead of
 conveying title to the underlying real
 property, but for a variety of reasons it is
 preferable to convey the property.
Ten days later, the Fields, through their attorney, replied that
they would consent to sale of the real estate in return for $10,000
and the fulfillment of several other minor conditions.
 On October 27, Mans's attorney let the Fields know by
letter that, although Mans would happily comply with the minor
conditions, the Fields' request for $10,000 was "out of the
question." Like its predecessor, the October 27 letter did not
disclose that the proposed sale had already taken place. There the
matter rested; discussions came to a close and the possibility of
a sale was not mentioned again by either party.
 Sometime in 1988, William Field was informed by a
business associate that there was a "new owner" of the property. 
Although the Fields visited the property often and talked with Mans
about the development of the property, they did not request a title
search nor did they ever ask Mans whether he had sold the property. 
The Fields spoke with an officer at Mascoma Savings Bank, the
holder of the first mortgage on the property, who told them that he
knew nothing about a transfer of the property. Even after the
transfer, Mans continued to make regular payments to the Fields in
accordance with the second mortgage.
 Real estate prices tumbled in the following years, and on
December 10, 1990, Mans filed for protection under Chapter 11 of
the Bankruptcy Code in the United States Bankruptcy Court for the
District of New Hampshire. Around the same time, he stopped making
payments to the Fields. At the time of the bankruptcy, Mans still
owed the Fields $144,266. Eventually, the first mortgagee
foreclosed, leaving nothing for the Fields. 
 Three months after Mans filed for bankruptcy, the Fields
learned about the October 1987 conveyance. The Fields filed a
complaint in the bankruptcy proceeding alleging that Mans's
personal obligation to them should not be discharged under 11
U.S.C. 523(a)(2)(A). The Fields contended that Mans's
attorney's two letters, seeking after-the-fact permission to sell
the real estate, fraudulently caused them to believe that it had
not yet been sold, and hence to forgo their right to accelerate the
note under the due-on-sale clause. As a consequence, they said,
Mans obtained an extension of credit by fraud.
 The bankruptcy court, ruling from the bench, found that
the letters from Mans's lawyer contained an implicit
misrepresentation "that the property had not yet been transferred
and that it would be transferred upon the consent of the Fields." 
The court also stated that "the evidence clearly establishe[d] that
the Fields relied on the implicit [mis]representation in these
letters" and "that they relied . . . to their detriment." In
respect to the latter finding, the bankruptcy court noted that in
October of 1987, "the real estate market was still booming in this
state and [the Fields] could have extracted their balance of
[$]187,000, approximately, out of either a foreclosure or forcing
Mans to pay out of the funds that he was getting invested in the
property or otherwise." Subsequently, as the court went on to
note, real estate values slumped, so that when the property was
foreclosed in 1991, the first mortgagee, in effect, wiped out the
Fields' position. Nevertheless, the court discharged the debt
because it found that the Fields had not acted reasonably. 
See Commerce Bank & Trust Co. v. Burgess (In re Burgess), 955 F.2d
134, 140 (1st Cir. 1992) (requiring a creditor to demonstrate
reasonable reliance), abrogated by Field v. Mans, 516 U.S. 59
(1995). The court found that Mr. Field was put on notice that
someone claiming to be the new owner was on the property and had
acquired other information that put him on inquiry notice. The
bankruptcy court's judgment was affirmed, in unpublished opinions,
by the district court and by this court. See Field v. Mans, 36
F.3d 1089 (1st Cir. 1994) (table), vacated by Field v. Mans, 516
U.S. 59 (1995).
 The Fields brought their challenge to the Supreme Court,
arguing that 523(a)(2)(A) does not require "reasonable" reliance. 
The Supreme Court agreed, holding that a creditor's reliance on
fraudulent statements need only be "justifiable." See Field, 516
U.S. at 73-75. Accordingly, the Court vacated and remanded the
case for further proceedings consistent with its opinion. See id.at 77. In a separate concurrence, Justice Ginsburg expressed her
opinion that "the causation issue [is] still open for determination
on remand." Id. at 78 (Ginsburg, J., concurring). Justices Breyer
and Scalia, dissenting, believed that the court below had performed
the correct analysis, even if it had used the wrong words. See id.at 80 (Breyer, J. dissenting).
 On remand, a different bankruptcy court reviewed the
original record and found that the Fields had justifiably relied
upon Mans's fraud. See In re Mans, 200 B.R. at 295. As a result,
the court refused to allow Mans's debt to the Fields to be
discharged in the bankruptcy proceeding. See id. at 296. Mans
filed a motion to alter or amend the judgment in which he sought to
argue that the Fields' forbearance did not constitute an extension
of credit and was not obtained by fraud. The court denied Mans's
motion, holding that the "law of the case" precluded him from
raising those points. See In re Mans, 203 B.R. at 357-58.
 Mans appealed from the second bankruptcy court's judgment
to the BAP, which reversed and dismissed the Fields' complaint. 
See In re Mans, 210 B.R. at 7. The BAP, after consideration,
declined to disturb the lower court's finding of justifiable
reliance. See id. at 5. However, it went on to address whether
the Fields' failure to exercise their option to accelerate the note
was an extension of credit within the 523(a)(2)(A) exception to
dischargeability. See id. at 6. Holding that it was not, the BAP
ruled that Mans was entitled to a discharge.
 On appeal, the Fields now argue that the judgment of the
BAP should be reversed because: (i) Mans is foreclosed from arguing
that their failure to accelerate was not an extension of credit;
and (ii) even if Mans may argue the point, their fraudulently
induced failure to accelerate satisfied the statutory elements of
 523(a)(2)(A). Mans rebuts the Fields' contentions, and adds that
their reliance was not justifiable.

 II.
 Section 523(a)(2)(A) bars discharge of "any debt . . .
for money, property, services, or an extension, renewal, or
refinancing of credit, to the extent obtained by . . . actual
fraud." The Fields undoubtedly extended credit to Mans on June 23,
1987, when they took Mans's note and mortgage in part payment of
the purchase price for their own real estate. No one suggests that
this original granting of credit to Mans was fraudulently induced. 
Rather, the Fields argue that four months later they were once
more, in effect, induced to extend credit this time fraudulently
 when Mans's attorney wrote them for permission to sell the
mortgaged property after it had been sold. Because these letters
encouraged the Fields to believe that the property was still
unsold, Mans is said to have misled them into not exercising their
right to accelerate, thus causing them to extend credit for
purposes of 523(a)(2)(A). The BAP rejected this interpretation,
and Mans asks us to do likewise.
 Before we reach that issue, however, we must address the
Fields' contention that the extension of credit question is no
longer an open issue in this case. The second bankruptcy court
agreed with the Fields that the "law of the case" doctrine barred
further litigation of the extension issue. See In re Mans, 203
B.R. at 357-58. We review an application of the law of the case denovo. See Dopp v. Pritzker, 38 F.3d 1239, 1245 (1st Cir. 1994) ("A
contention that the law of the case precludes reexamination of an
issue raises a pure question of law, and, thus, engenders plenary
review.").
A. Whether the Law of the Case Now Bars Litigation of the
 Extension Issue.
 The law of the case doctrine is a prudential principle
that "precludes relitigation of the legal issues presented in
successive stages of a single case once those issues have been
decided." Cohen v. Brown Univ., 101 F.3d 155, 167 (1st Cir. 1996). 
For a bar to exist, an issue must have been "actually considered
and decided by the appellate court," or a decision on the issue
must be "necessarily inferred from the disposition on appeal." 
Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd., 41 F.3d 764,
770 (1st Cir. 1994); see also Christianson v. Colt Indus. Operating
Corp., 486 U.S. 800, 817 (1988) (stating that "the law of the case
turns on whether a court previously 'decide[d] upon a rule of law'"
(quoting Arizona v. California, 460 U.S. 605, 618 (1983)));
Quern v. Jordan, 440 U.S. 332, 347 n.18 (1979) ("The doctrine of
law of the case comes into play only with respect to issues
previously determined."). The doctrine does not bar litigation "of
all questions which were within the issues of the case and which,
therefore, might have been decided." Conkling v. Turner, 138 F.3d
577, 587 (5th Cir. 1998) (internal quotation marks and citations
omitted); Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
Federal Practice & Procedure 4478, at 789 (1981) ("[Q]uestions
that have not been decided do not become law of the case merely
because they could have been decided."). Even if an issue has been
decided previously, we may reopen it if warranted by the
circumstances of the case. See Christianson, 486 U.S. at 817 ("A
court has the power to revisit prior decisions of its own or of a
coordinate court in any circumstance, although as a rule courts
should be loathe to do so in the absence of extraordinary
circumstances."); Arizona, 460 U.S. at 618 ("Law of the case
directs a court's discretion, it does not limit the tribunal's
power.").
 The law of the case takes at least two forms. First, it
prevents a litigant from resurrecting an issue that has already
been decided by a lower court and that has gone unchallenged on
appeal. See United States v. Connell, 6 F.3d 27, 30 (1st Cir.
1993) (declaring that "litigants should not ordinarily be allowed
to take serial bites at the appellate apple"); United States v.
Bell, 988 F.2d 247, 250 (1st Cir. 1993) (stating that "a legal
decision . . . unchallenged in a subsequent appeal despite the
existence of ample opportunity to do so, becomes the law of the
case"). The Fields argue that this version of the doctrine applies
to the present case because the initial bankruptcy court found that
they had granted an extension of credit.
 Second, the law of the case in the guise of the
"mandate rule" instructs an inferior court to comply with the
instructions of a superior court on remand. See United States v.
Rivera-Martinez, 931 F.2d 148, 150 (1st Cir. 1991). Relying on
this version of the doctrine, the second bankruptcy court held that
it was precluded from revisiting the extension issue because the
Supreme Court mandate implicitly decided the issue. We treat each
of these arguments in turn.
 The Fields contend that the initial bankruptcy court
decided that the Fields' fraudulently induced ignorance of the sale
both gave rise to a "debt . . . for an extension . . . of credit"
within 523(a)(2)(A) and also caused them not to call the note and
mortgage. Thereafter, they say, Mans took insufficient steps to 
preserve his opposition to these rulings in the district court and
this court.
 The first bankruptcy court did indeed find a credit
extension. It announced:
 [T]o the extent that the reliance and
 detriment elements are required here, it's
 obvious to me that [the Fields] in their own
 minds did rely on these representations
 subjectively and didn't do anything further
 and that in effect they extended the credit to
 Mr. Mans for another few years, . . . whereas
 they could have called the due on sale clause
 as of October 1987 at the latest when the deed
 was recorded.
Record at 20, Decision of the Court, May 11, 1993(emphasis added).
 On the related point of whether the Fields would, in
fact, have exercised their acceleration remedy had they known of
the sale, the court made no definitive finding, and, indeed,
indicated very great skepticism. It said:
 [W]hat really happened here was that the deal
 broke down because of the [Fields'] demand for
 the [$]10,000 and the market was strong and
 Mans was paying and it's to some extent
 hindsight to now say, well, if we'd know[n]
 then we would have called the loan. Nobody
 knew in October 1987 that the market was going
 to take a nose-dive. . . .

 In this case, I think there is a lot of
 hindsight here as to how serious this appeared
 to the Fields at the time and whether they
 would have triggered the due on sale clause.
Id., at 23-24.
 While recognizing that the bankruptcy court had, to some
degree, found an extension of credit, the BAP concluded that that
finding never became the law of the case because "the Debtor had
nothing to appeal as a result of the instant trial. He had won. 
Appeal is taken from a court's judgment, order or decree, not from
a ruling of law."
 We agree with the BAP. The bankruptcy court's finding of
a credit extension was not necessarily conclusive and Mans, having
secured a favorable judgment on the ground that the Fields'
reliance was unreasonable, had no reason to contest this and other
subordinate findings on appeal. See Bath Iron Works Corp. v.
Coulombe, 888 F.2d 179, 180 (1st Cir. 1989) (holding that a party
cannot appeal a favorable judgment); Balcom v. Lynn Ladder &
Scaffolding Co., 806 F.2d 1127, 1127 (1st Cir. 1986) ("Appellant
cannot appeal the district court's failure to set aside [an
adverse] finding for the basic reason that appellant did not lose
the case below; it won."). And the Fields, of course, had no
incentive to raise the point in their initial appeals to the
district court and this court.
 It is true that, to preserve an alternate theory, an
appellee might in some situations be required to raise the point in
its appellate briefs. Much depends on the particular facts. Mans
apparently never presented the absence of an extension of credit as
an alternative ground for upholding the bankruptcy court in his
district court and court of appeals briefs. But as Justice
Ginsburg pointed out, see Field, 516 U.S. at 77 (Ginsburg, J.,
concurring), and as this court's decision by unpublished per curiam
reflects, First Circuit precedent was solidly in Mans's corner on
the reasonable reliance ground resolved in his favor by the
bankruptcy court. It would be extremely unrealistic to expect
Mans's attorney to buttress his client's case by putting forward an
alternate theory in support of the lower court's judgment. Once it
became clear that the Fields were attacking the legal theory
supporting the judgments below the reasonableness requirement 
before the Supreme Court, Mans raised the extension point. See id.at 63 n.2. We are loath to find that Mans waived the extension
issue merely by failing to file either a procedurally dubious
cross-appeal in the district court and in this court, see Crockerv. Piedmont Aviation, Inc., 49 F.3d 735, 741-42 (D.C. Cir. 1995),
or to brief and argue what, to any attorney, might have seemed an
entirely redundant point.
 The same reasoning leads us to reject any notion of a
law-of-the-case bar to the related issue of whether the Fields
would actually have invoked their acceleration rights had they
known of the sale. The lower court never made a definitive finding
or ruling on that point. This issue, moreover, forms a part of the
"causation" question that Justice Ginsburg, in her separate
concurrence, highlighted as still open for review on remand. SeeField, 516 U.S. at 77 (Ginsburg, J., concurring). While none of
Justice Ginsburg's colleagues joined in her blunt assertion that
the "causation question is still open for determination," id.,
neither did any demur, and we, of course, treat every Justice's
view with great respect.
 We turn next to the second bankruptcy court's belief 
that it was precluded from deciding the extension issue by
implications found within the Supreme Court's mandate. The Supreme
Court refused to address the question whether Mans had received any
extension of credit because it was "never raised previously and
[was] not fairly subsumed within the question on which [the Court]
granted certiorari." Field, 516 U.S. at 63 n.2. The second
bankruptcy court seems to have inferred from this statement, and
the Court's remand order, that the Court agreed on the merits with
the initial bankruptcy court's decision. See In re Mans, 203 B.R.
at 357 ("The Supreme Court . . . chose instead to remand on the
reliance issue. The necessary inference to be drawn is that the
Supreme Court agreed with [the initial bankruptcy judge's] finding
[on the causation issue].").
 That inference cannot be supported. In contrast to the
cases upon which the bankruptcy court relied, see Kotler v.
American Tobacco Co., 981 F.2d 7, 13 (1st Cir. 1992) (refusing to
revisit an issue outside of the Supreme Court's remand for
reconsideration in light of an intervening case); Stark v. Advanced
Magnetics, Inc., 894 F. Supp. 555, 558 (D. Mass. 1995) (noting
that, after a grant of summary judgment, a remand on one issue
necessarily implied that none of the other issues before the court
were determinative), rev'd on other grounds, 119 F.3d 1551 (Fed.
Cir. 1997), the Supreme Court's mandate here did not contain any
express or implied limitation. The Court issued a general remand
order. See Field, 516 U.S. at 77 (ordering the case remanded "for
proceedings consistent with this opinion"). In a footnote to its
opinion, the Court stated that the extension of credit issue was
not within the question on which it had granted certiorari. 
See id. at 63 n.2. A court that refuses to address an issue on
procedural grounds cannot reasonably be said to have decided the
merits of that issue, even implicitly. Under these circumstances,
then, we see no Supreme-Court-mandated bar to consideration on
remand of whether what occurred here amounted to an extension of
credit nor of the related "causation" issues.
 We conclude that the question of law as to whether the
events of this case could amount to an extension of credit obtained
by fraud for purposes of 11 U.S.C. 523 is not foreclosed by the
law of the case doctrine.
B. Whether Mans's Fraud Caused the Fields to Grant an
 Extension of Credit.
 Section 523(a)(2)(A) disallows the discharge of an
individual debtor from any debt "for . . . an extension, renewal,
or refinancing of credit, to the extent obtained by . . . false
pretenses, a false representation, or actual fraud." The BAP
determined that Mans did not lose his discharge right under this
section because the Fields' failure to accelerate, to the extent
caused by fraud, was not an extension of credit within 
523(a)(2)(A). The Fields now reply that their fraud-induced
misapprehension that a sale had not yet occurred frustrated their
option to have called the debt, causing them, in effect, to have
extended credit involuntarily. We review that argument de novo.
 We look first to the text of the statute. See Shawmut
Bank, N.A. v. Goodrich (In re Goodrich), 999 F.2d 22, 24 (1st Cir.
1993) ("[T]he simple language of section 523(a)(2)(B) is the
starting point for analysis and, in the end, the basis for our
decision."). Because the Bankruptcy Code does not define the word
"extension," we inquire into the term's ordinary meaning. There
are at least two meanings of the word "extension" that could apply
to 523(a)(2)(A). First, an "extension" can refer to an offer "to
make available (as a fund or privilege)." Webster's Third New
International Dictionary 804 (1971) (noting that an "extension" is
"the action of extending," and that to "extend" can mean to
"proffer"). Under this definition, the Fields' only extension of
credit came four months prior to Mans's fraudulent letters, when
the Fields accepted part of the purchase price for their real
property in the form of a note secured by a mortgage payable over
a ten-year period. That credit extension was not "obtained by" the
fraud. See Guy v. Leeb (In re Guy), 101 B.R. 961, 979 (Bankr. N.D.
Ind. 1988) (noting that, in order to prevent discharge under
 523(a)(2)(A), "a creditor must have given present consideration
based on the . . . actual fraud"); Marine Bank Southwest, N.A. v.
Hoffmann (In re Hoffman), 80 B.R. 924, 926 (Bankr. N.D. Ill. 1988)
(dismissing the possibility that a bank relied on fraudulent
statements made after it issued a loan).
 Second - and more relevantly - an extension may be an
"increase in length of time" or "an agreement on or concession of
additional time (as for meeting an overdue debt or fulfilling a
legal formality)." Webster's Third New International Dictionary804-05 (1971). Granting additional time to pay the note would, for
example, have met this definition. Did misleading the Fields into
believing no sale had occurred, thereby preventing them from
exercising their acceleration right, constitute, in this sense, an
"extension" of credit? But for the fraud they could have 
withdrawn the credit they had previously extended. The fraud
ensured that the Fields would continue to extend credit to Mans
even though they now possessed and, absent the fraud, would have
known they possessed, the absolute right to withdraw it.
 To be sure, the fraudulently concealed sale did not alter
the existing terms of credit, assuming the loan was not called. 
Instead, it undermined the Fields' right to have forthwith
terminated that credit because of the unpermitted sale had they
wished to do so. Still, it is no great leap to say that fraudulent
concealment and frustration of the Fields' acceleration right was
tantamount to an "extension," i.e. continuation, of the existing
credit. Section 523(a)(2)(A) is said to "encompass[] virtually
every form of new agreement with respect to existing credit," 4
Lawrence P. King, Collier Bankruptcy Practice Guide 76.05[1], at
76-17 (15th ed. 1997) (emphasis added). While the concealed sale
was not technically a new "agreement" concerning the existing
credit, it triggered legal rights under the existing credit
agreement which markedly altered the credit relationship between
the parties. We, therefore, agree with the Fields that, by
deceiving them into continuing a credit arrangement they now had
the right to terminate, the fraud related to what can properly be
called "an extension of credit." As the Fields would or could have
called the note had they known the truth, Mans's fraud tended to
perpetuate hence "extend" credit that otherwise the Fields
would or could have stopped. 
 It is, of course, implicit in the Fields' argument that
they would, or at least might, have called the note had they known
of Mans's sale. The Fields were never allowed to decide for
themselves whether to call the note because Mans's fraud prevented
them from knowing that the property had been sold without their
permission, giving them the acceleration option. The first
bankruptcy court believed that, in the good times then prevailing, 
it was uncertain whether the Fields would have called the note had
they learned of the sale. There was contemporaneous documentary
evidence that the Fields said they would agree to the proposed sale
only if paid $10,000, and these facts are essentially undisputed. 
This suggests that they might well have exercised their
acceleration right had the consummated, unpermitted, sale come to
their attention. But regardless of any uncertainty as to what the
Fields would have done had they not been lulled into believing that
no sale had yet occurred, we disagree with the BAP that in order 
for failure to accelerate to be equivalent to an extension of
credit "there would have to be virtual certainty that
acceleration would have taken place." We think it enough, seebelow, that the Fields were in a position to have accelerated
effectively and might well have done so. 
 When interpreting 523, a court must weigh two competing
policies. On the one hand, the bankruptcy system is designed to
afford a financially distressed individual or entity a "fresh
start." Grogan, 498 U.S. at 286-87. On the other hand, 523
prevents a deceitful debtor from prospering as a result of his
fraud. See id. Putting these policies together, the Supreme Court
in Grogan explained that the Bankruptcy Act "limits the 
opportunity for a completely unencumbered new beginning to the
'honest but unfortunate debtor.'" Id. at 287 (quoting Local Loan
Co. v. Hunt, 292 U.S. 234, 244 (1934)). This description implies
that the "fresh start" policy underlying the bankruptcy code gives
way when a debtor has defrauded his creditor. While the fraud must
pertain to a debt falling into one of the several categories listed
in 523(a)(2)(A), these categories ["any debt . . . for money,
property, services, or an extension, renewal, or refinancing of
credit . . ."] are themselves quite inclusive. They include all
ordinary debts("money, property, services") as well as ones for
credit "renewal, or refinancing" in addition to credit "extension." 
The comprehensiveness of the debt categories, and the Supreme
Court's emphasis on limiting a "new beginning" to the "honest but
unfortunate debtor," militate against a narrow and hyper-technical
parsing of the individual terms. Otherwise, one dishonest debtor
would receive a "new beginning" while another, who engaged in
fraudulent conduct that was virtually identical, would not for
reasons unrelated to the object of denying bankruptcy protection to
debtors whose debts were procured by fraud. We see no indication
that Congress would have wished courts to construe "extension,
renewal, or refinancing of credit," and its companion phraseology,
in other than a practical, commonsense manner, consistent with the
above policy. This is not to question that the fraud must relate
to a debt that fits within one or more of the statutory categories. 
But these debt categories, as said, are part of a listing which by
its very comprehensiveness indicates Congress's desire for
inclusion rather than exclusion. Mans's fraud was designed
affirmatively to mislead the Fields into thinking that no sale had
yet occurred when, in fact, it had. As a result of the deceit,
Mans could hope to continue to enjoy the on-going credit
arrangement which the Fields might otherwise have ended. On this
analysis, Mans's indebtedness to the Fields at the time of the
bankruptcy can reasonably be construed as falling within the rubric
of a fraudulently obtained extension of credit. Indeed, Mans's
indebtedness might also be viewed, under a very similar analysis, 
as the product of a fraudulent "renewal" of credit. In any case,
Congress's utilization of three words "extension, renewal, or
refinancing of credit" [emphasis supplied] makes plain its
intention to cast a net sufficiently broad to ensnare the present
fraud. 
 Mans argues that we should instead construe "extension of
credit" very narrowly, giving the phrase only its most limited and
narrow meaning, while ignoring the companion terms "renewal" and
"refinancing" which reinforce the comprehensive nature of
Congress's design. He would have us exclude altogether a fraud
designed to prevent a creditor in an existing credit arrangement
from exercising an acceleration remedy. Mans stresses the
uncertainty of whether the Fields would have accelerated in the
optimistic financial climate prevailing at the time of the fraud. 
If not, Mans points out, there would be no actual extension of
credit since, regardless of the fraud, the same existing credit
arrangement would have continued in effect.
 We do not accept this argument. It does not lie in
Mans's mouth, having cheated the Fields of their opportunity to
have decided in October of 1987 whether or not to exercise their
acceleration right, to argue that they must now bear the difficult
burden of demonstrating beyond question that they would, in fact,
have accelerated the loan. We think it enough that the bankruptcy
court found that, when the fraud occurred, the economic
circumstances would have allowed the Fields to have successfully
recovered their loan had they wished to do so. The original
bankruptcy court found that in October 1987, when the fraud
occurred, "the real estate market was still booming in this state
and [the Fields] could have extracted the balance of [$] 187,000,
approximately, out of either a foreclosure or forcing Mans to pay
out of the funds that he was getting invested in the property, or
otherwise." Subsequently, by the time of Mans's bankruptcy, the
market had slumped and the first mortgage had wiped out the Fields'
position. This was, therefore, a situation where the Fields had an
equity in the property at the time of the fraud and could have
recovered their debt had they elected at that time to exercise the
acceleration clause. Mans's fraud deprived them of that
opportunity. 
 To establish an extension or renewal of credit, we think
it suffices that the Fields were positioned rationally to have
called the loan that they would have recovered had they done so
and that their choice, with its potential for benefit, was
eliminated by Mans's actual fraud. To force them to prove not only
that they might realistically have exercised their acceleration
remedy at the time, but that they necessarily would have done so,
would place the shoe on the wrong foot, allowing a defrauder to
escape the consequences of his fraud in all but the most unusual
and clear-cut circumstances. Mans's lawyer's misstatements are the
reason why the Fields' course of action must always, in some sense,
remain speculative; it is fair that the weight of uncertainty
should fall on Mans. See Takeuchi Mfg. (U.S.) Ltd. v. Fields, 44
B.R. 322, 329 (Bankr. S.D. Fla. 1984) (preventing discharge after
noting that it was the debtor's fraud that made causation
hypothetical). Our determination accords with the vast majority of
cases in this area, which hold that a failure to accelerate amounts
to an extension of credit. 
 We are, therefore, satisfied on these facts that the
Fields are entitled to cause Mans to forgo his bankruptcy discharge
remedy. To reiterate, we disagree with the BAP that Mans's fraud
 misleading the Fields into believing that no sale had occurred
and hence that they had no right then and there to terminate Mans's
credit arrangement did not create a debt for "an extension,
renewal, or refinancing of credit." In so concluding, we find it
important that the Fields could, at the time of the fraud, have
accelerated and extracted the balance then owed from the mortgaged
property or from funds then available to Mans. In such
circumstances, acceleration having been a reasonable option, the
Fields do not now have the further burden of demonstrating to a
"virtual certainty" that they would have elected to accelerate. 
Rather, for Mans to preserve his own right to the "fresh start"
provided by bankruptcy, it was his burden, which he failed to
carry, to have established affirmatively that acceleration would
not have been a feasible choice because of the absence of any
remaining value in the real estate and of available funds from
which the Fields could reasonably have expected to recover what was
owing to them, or for some other reason rendering exercise of the
acceleration remedy futile at the time of the fraud. 
 Our holding should in no way be read to weaken the
requirement that (1) plaintiffs such as the Fields prove actual
fraud; and (2) the fraud relate to one of the statutorily listed
debt categories in 523(a)(2)(A), reasonably construed. We hold
merely that, on these facts, both elements were established. We
recognize the danger that creditors, in order to defeat bankruptcy
protection, may improperly seek to twist mere breaches of contract
or negligent errors into actual frauds. Nothing herein should be
read to support such endeavors. 
C. Justifiable Reliance 
 Mans further argues on appeal that the bankruptcy judge
and BAP both erred in determining that the Fields had justifiably
relied on Mans's fraud. We think the BAP correctly construed and
applied the "justifiable" reliance standard adopted by the Supreme
Court in Field, 516 U.S. 59, and properly deferred to the
bankruptcy court's findings on the matter, including the absence of
a "warning of deception." See Sanford Inst. For Savings v. Gallo, 
No. 98-9004, slip op. at 11 (1st Cir. September 4, 1998) (in
absence of any "warning signs . . . i.e., obvious or known
falsities," a party may justifiably rely on a misrepresentation).
We affirm the bankruptcy court's finding of justifiable reliance.
 Reversing the determination of the Bankruptcy Appellate
Panel, we affirm the bankruptcy court's determination that Mans's
indebtedness to the Fields is non-dischargeable. 
 So Ordered.